**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
HOSAM ABDELDAYEM,                                        Case No.

                       Plaintiff,                    **COMPLAINT**

    -against-
                                                        **Jury Trial Demanded**
GIORGIO'S OF GRAMERCY, INC., GIORGIO'S
OF GRAMERCY LLC, and NIKOLAOS
GRAMMATIKOPOULOS a/k/a NICK GRAMS,

                      Defendants.
-------------------------------------------------------------X

      Plaintiff Hosam Abdeldayem ("Abdeldayem" or "Plaintiff"), by his attorneys, Akin Law

Group, PLLC, allege against Defendants Giorgio's of Gramercy, Inc. ("the Corporation"),

Giorgio's of Gramercy LLC ("the LLC") (the Corporation and the LLC, collectively, "Giorgio's")

and Nikolaos Grammatikopoulos a/k/a Nick Grams ("Grams") (Giorgio's and Grams, collectively,

"Defendants"), upon information and belief, as follows:

## NATURE OF THE CLAIMS

1. Giorgio's operates a restaurant that sells food and beverages (including alcoholic
   beverages) for sale to the public for consumption on the premises, for takeout, and for
   delivery.

2. Grams is the owner, shareholder, and/or principal of Giorgio's and is responsible for the
   day-to-day operations of Giorgio's' business.

3. From on or around October 1, 2018, until on or around March 20, 2020, and again from on
   or around July 1, 2020, until on or around March 5, 2022, Defendants jointly employed
   Abdeldayem, giving him the title of Executive Chef.

4.  Although Defendants styled Abdeldayem's title as "Executive Chef", for the duration of his employment with Giorgio's, Abdeldayem was a non-exempt employee.

5.  In his capacity as Giorgio's' "Executive Chef", Abdeldayem's primary duties and responsibilities included, but were not limited to: cleaning and preparing the meat and fish (i.e. cutting, fileting, etc.), preparing sauces, vegetables, and mise en place, cooking the food, assisting other cooks, cleaning the kitchen, and washing dishes.

6.  Defendants maintained a pattern and practice of failing to pay Abdeldayem the overtime rate of one-and-one half (1 ½) times his regular hourly/applicable minimum wage rate for all hours worked in excess of 40 hours per week.   Additionally, on a regular basis throughout his employment, Defendants failed to promptly pay Abdeldayem's wages after having set his regular payday.

7.  Defendants effectively paid Plaintiff a flat daily wage for each day he worked, by a combination of payroll check, business check, personal check, and cash.   This payroll scheme is an obvious and willful avoidance of Defendants' obligation to pay overtime wages, as required under state and federal law.

8.  Defendants additionally failed to pay Plaintiff spread-of-hours pay for each workday his shift or shifts exceeded 10 hours per day.

9.  Defendants further unlawfully retained Abdeldayem's wages.   For the portion of Abdeldayem's daily wage that was paid by cash or by non-payroll check, Defendants withheld a certain amount per day, allegedly for taxes.   However, Defendants retained all or part of Abdeldayem's wages which they withheld from the business check, personal check, and cash wage payments purportedly for taxes.

10. In addition to the aforementioned violations, Defendants also failed to furnish to Plaintiff a wage notice at the time of his hire and rehire, and, during both periods of employment,

Defendants failed to furnish Plaintiff with pay statements completely and accurately reflecting, *inter alia*, the hours he worked and pay he received.

11. Defendants further failed to maintain an accurate record keeping of hours worked and wages paid to Plaintiffs.

12. Defendants have systematically and repeatedly ignored the requirements of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*., ("FLSA") and the New York Labor Law § 190 *et seq*., ("NYLL").   Plaintiff seeks relief for Defendants' unlawful actions, including compensation for unpaid overtime wages, spread-of-hours pay, liquidated damages, statutory civil damages, pre- and post-judgment interest, and attorney's fees and costs, pursuant to the FLSA and NYLL.

13. Plaintiff further seeks to recover damages to redress the injuries he suffered as the result of being retaliated against by Defendants for complaining of Defendants' improper pay practices, in violation of 29 U.S.C. § 215(a) and NYLL § 215.

## JURISDICTION AND VENUE

14. This Court has original federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b) for causes of action brought under the FLSA, 29 U.S.C. § 201 *et seq*.

15. This Court has supplemental jurisdiction over the claims brought under New York State law pursuant to 28 U.S.C. § 1367, as the claims are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

16. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391, because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district.

17. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

**Plaintiff Hosam Abdeldayem**

18. At all times relevant to this action, Abdeldayem was and is a resident of Kings County, New York.

19. From on or around October 1, 2018, until on or around March 20, 2020, and again from on or around July 1, 2020, until on or around March 5, 2022, Abdeldayem was an employee of Defendants under all applicable statutes.

20. At all times during his employment with Defendants, Abdeldayem was an employee engaged in commerce or the production of goods for commerce on behalf of Defendants.

21. Specifically, while employed by Defendants, Abdeldayem used ingredients produced outside the State of New York and transported via interstate commerce to Defendants' restaurant location in New York to prepare and cook food items sold to Defendants' customers. Additionally, Abdeldayem used cleaning products and materials manufactured outside the state of New York and transported via interstate commerce to Defendants' restaurant location in New York to clean the kitchen.

22. During his employment with Defendants, Abdeldayem was at all times subordinate to and under the direct supervision of Grams.

**Defendant Giorgio's of Gramercy, Inc.**

23. The Corporation was and is a domestic business corporation duly organized and existing under the laws of the State of New York.

24. At all times relevant to this action, the Corporation was and is a for-profit entity authorized to conduct business pursuant to the laws of the State of New York.

25. The Corporation's principal offices are located at 27 East 21st Street, New York, New York 10010-6208.

26. At all times relevant to this action, the Corporation was and is a business or enterprise engaged in interstate commerce.

27. At all times relevant to this action, the Corporation has employees engaged in commerce or in the production of goods for commerce and handling, selling, or otherwise working on goods or materials that have been moved in produced for commerce by any person.

28. At all times relevant to this action, the Corporation—along with the LLC—operates as the restaurant known as "Giorgio's of Gramercy".

29. At all times relevant to this action, Grams was and is an owner, shareholder, and/or principal of the Corporation.

30. At all times relevant to this action, Grams was and is an officer of the Corporation.

31. At all times relevant to this action, the Corporation operates and controls an enterprise engaged in commerce with an annual gross volume of business done exceeding $500,000.

32. From on or around October 1, 2018, until on or around March 20, 2020, and again from on or around July 1, 2020, until on or around March 5, 2022, the Corporation was an employer of Abdeldayem within the meaning of all applicable statutes.

**Defendant Giorgio's of Gramercy LLC**

33. The LLC was and is a domestic limited liability company duly organized and existing under the laws of the State of New York.

34. At all times relevant to this action, the LLC was and is a for-profit entity authorized to conduct business pursuant to the laws of the State of New York.

35. The LLC's principal offices are located at 27 East 21st Street, New York, New York 10010-6208.

36. At all times relevant to this action, the LLC was and is a business or enterprise engaged in interstate commerce.

37. At all times relevant to this action, the LLC has employees engaged in commerce or in the production of goods for commerce and handling, selling, or otherwise working on goods or materials that have been moved in produced for commerce by any person.

38. At all times relevant to this action, the LLC—along with the Corporation—operates as the restaurant known as "Giorgio's of Gramercy".

39. At all times relevant to this action, Grams was and is an owner, shareholder, and/or principal of the LLC.

40. At all times relevant to this action, Grams was and is an officer of the LLC.

41. At all times relevant to this action, the LLC operates and controls an enterprise engaged in commerce with an annual gross volume of business done exceeding $500,000.

42. From on or around October 1, 2018, until on or around March 20, 2020, and again from on or around July 1, 2020, until on or around March 5, 2022, the LLC was an employer of Abdeldayem within the meaning of all applicable statutes.

**Defendant Nikolaos Grammatikopoulos a/k/a Nick Grams**

43. Grams, upon information and belief, was and is a resident of the State of New York.

44. At all times relevant to this action, Grams served as a principal, shareholder, officer, owner, and/or manager of the Corporation.

45. At all times relevant to this action, Grams served as a principal, shareholder, officer, owner, and/or manager of the LLC.

46. Grams possesses or possessed an ownership interest in the Corporation and possessed and exercised operational control over and policy making authority within the Corporation.

47. Grams possesses or possessed an ownership interest in the LLC and possessed and exercised

operational control over and policy making authority within the LLC.

48. At all times relevant to this action, Grams possessed and exercised the power and authority vested in him by the Corporation to hire and fire employees, establish the rate and method of pay of employees, determine work schedules, control labor relations and personnel policies, maintain employment records, assign employees' duties and responsibilities, evaluate employees' performance, and otherwise determine terms and conditions of the employment of the Corporation's employees, including Plaintiff.

49. At all times relevant to this action, Grams possessed and exercised the power and authority vested in him by the LLC to hire and fire employees, establish the rate and method of pay of employees, determine work schedules, control labor relations and personnel policies, maintain employment records, assign employees' duties and responsibilities, evaluate employees' performance, and otherwise determine terms and conditions of the employment of the LLC's employees, including Plaintiff.

50. Employees of the Corporation could complain to Grams directly regarding any of the terms of their employment, and Grams would have the authority to effect any changes to the quality and terms of their employment.

51. Employees of the LLC could complain to Grams directly regarding any of the terms of their employment, and Grams would have the authority to effect any changes to the quality and terms of their employment.

52. The acts of the Corporation charged in this Complaint were authorized, directed or accomplished by Grams individually, by himself or his agents, officers, employees or representatives, while actively engaged in the management of the Corporation.

53. The acts of the LLC charged in this Complaint were authorized, directed or accomplished by Grams individually, by himself or his agents, officers, employees or representatives, while

actively engaged in the management of the LLC.

54. Grams is personally and jointly and severally liable for the violations of the FLSA and NYLL by the Corporation.

55. Grams is personally and jointly and severally liable for the violations of the FLSA and NYLL by the LLC.

**Defendants Are Joint Employers of Plaintiff**

56. At all times relevant to this action, and as a matter of economic reality, Defendants were employers and/or joint employers of Plaintiff within the meaning of the FLSA and NYLL.

57. Facts that demonstrate that Defendants were Plaintiff's employers include:

    a. Defendants all suffered or permitted Plaintiff to work.

    b. Each of the Defendants acted directly or indirectly in the interest of one another in relation to Plaintiff.

    c. Defendants all simultaneously benefitted from Plaintiff's work.

    d. Defendants each had either functional and/or formal control over the terms and conditions of Plaintiff's work.

    e. Plaintiff performed work integral to each Defendant's operation.

    f. Each Defendant had substantial control over Plaintiff's working conditions and over the unlawful policies and practices alleged herein.

58. Defendants' operations were interrelated and unified.

59. Defendants shared a common management and was centrally controlled and/or owned by Defendants.

60. For the duration of Plaintiff's employment with Defendants, the Corporation and the LLC— each owned by Grams—jointly operated the restaurant known as Giorgio's of Gramercy.

61. For the duration of Plaintiff's employment with Defendants, the Corporation and the LLC, at

Grams' direction, controlled the terms and conditions of Plaintiff's employment.

62. By way of example, during Plaintiff's employment, Grams paid Plaintiff's wages—in part—by issuing Plaintiff checks from both the Corporation's and the LLC's bank accounts. When Plaintiff was paid by business check from either the Corporation or the LLC, Defendants did not identify any specific work or tasks performed by Plaintiff that were in service of only the payor entity, and the payment made to Plaintiff did not correlate with any work performed by Plaintiff that could be ascribed to only the payor entity.

63. Defendants paid Plaintiff's wages, in part, by issuing a payroll check to Plaintiff from the LLC. For these payments, Defendants issued Plaintiff a W-2.

64. In making the payments to Plaintiff for his wages—whether by paycheck from the LLC, business check from the LLC, business check from the Corporation, or cash (of which the originating account is presently unknown)—Defendants did not distinguish the source of payment to Plaintiff for the work performed for any individual entity. All payments made by Defendants to Plaintiff for his wages, regardless of the source, were for the work performed by Plaintiff at the restaurant operated by Defendants, for the mutual benefit of all Defendants.

65. The Corporation checks, LLC checks, and LLC W-2 issued to Plaintiff from Defendants for his wages all bore the restaurant's address (27 East 21st Street, New York, New York 10010).

66. During Plaintiff's employment, Giorgio's restaurant maintained a liquor license issued by the New York State Liquor Authority to the Corporation, issued to the restaurant's address (27 East 21st Street, New York, New York 10010) and identifying Grams as the Principal.

67. For the duration of Plaintiff's employment with Defendants, the Corporation and the LLC, at the direction of Grams, jointly operated Giorgio's restaurant—Plaintiff's workplace.

**FACTUAL ALLEGATIONS**

68. On or about October 1, 2018, Abdeldayem initially commenced employment with Defendants.

69. For the duration of his employment with Defendants, Abdeldayem reported to work at the Giorgio's restaurant location—27 East 21st Street, New York, New York 10010.

70. For the duration of his employment with Defendants, Abdeldayem held the title of Executive Chef.

71. Although Giorgio's styled Abdeldayem's title as "Executive Chef", for the duration of his employment with Defendants, Abdeldayem was a non-exempt employee.

72. Despite Abdeldayem's title, Defendants did not endow Abdeldayem with any independent managerial or creative authority over Defendants' employees or operations.

73. For the duration of his employment with Defendants, Abdeldayem did not have the authority to hire or fire Defendants' employees, set their rates of pay or schedules, approve employee requests for sick or vacation days, or otherwise exercise control over the terms and conditions of Defendants' employees.

74. Further, for the duration of his employment with Defendants, Abdeldayem had no independent authority to select vendors, unilaterally incur expenses on behalf of the restaurant, manage restaurant operations, create the restaurant menu, or otherwise make decisions of significance related to Defendants' business operations.

75. For the duration of Abdeldayem's employment with Defendants, Abdeldayem's primary duties and responsibilities entailed manual labor, such as preparing food for cooking, cooking the food, and cleaning the kitchen.

76. For the duration of Abdeldayem's employment with Defendants, Abdeldayem spent approximately 30 minutes per week discussing the menu with Grams and receiving

approval (or rejection) of menu changes and requests for purchase of necessary kitchen equipment and ingredients.

77. For the duration of his employment with Defendants, Abdeldayem's weekly discussion with Grams about the menu and purchase of kitchen items was the only non-manual labor performed by Abdeldayem for Defendants.

78. For the duration of his employment with Defendants, due to his preparation and cleaning responsibilities, Abdeldayem worked before the kitchen opened and after it closed for the evening.

79. Throughout his employment with Defendants, the number of days per week Abdeldayem worked varied, but the approximate amount of hours he worked on each day of the week stayed the same.

80. For the duration of Abdeldayem's employment with Defendants, when he worked on any of the following days, Abdeldayem worked approximately the following hours per day:

  a. Monday-Wednesday, from 2:30 p.m.-12:00 a.m.

  b. Thursday, from 2:30 p.m.-12:30 a.m.

  c. Friday and Saturday, from 2:30 p.m.-1:30 a.m.

  d. Sunday, from 2:30 p.m.-12:00 a.m.

81. Because Defendants largely ignored the Coronavirus-related restrictions imposed by state and local authorities, the hours worked by Abdeldayem on any given day did not change during the pandemic.

82. As a result, for the duration of Abdeldayem's employment with Defendants, Abdeldayem's workday exceeded 10 hours whenever he worked on Thursday, Friday, or Saturday.

83. Abdeldayem worked the following number of days per week during the following periods of his employment with Defendants:

a.  From approximately October 1, 2018-March 19, 2020, Abdeldayem regularly worked six days per week (usually, Tuesday-Sunday, 60.5 hours per week). However, approximately one week per month, Abdeldayem covered a shift for an absent kitchen employee, resulting in him working seven days in that week (70 hours per week).

b.  On or around March 20, 2020, as more fully described below, Defendants effectively terminated Abdeldayem.  After poor reviews and customer complaints about the quality of the food, Defendants rehired Abdeldayem on or around July 1, 2020.

c.  From approximately July 1, 2020-September 30, 2020, Abdeldayem regularly worked two days per week—Friday and Saturday (22 hours per week).

d.  From approximately October 1, 2020-December 31, 2020, Abdeldayem regularly worked three days per week—Thursday, Friday, and Saturday (32 hours per week).

e.  From approximately January 1, 2021-January 22, 2021, Abdeldayem regularly worked four days per week—Wednesday, Thursday, Friday, and Saturday (41.5 hours per week).

f.  From approximately January 23, 2021-February 2, 2022, Abdeldayem resumed his pre-termination schedule, regularly working six days per week (usually, Tuesday-Sunday, 60.5 hours per week), and, approximately one week per month, covering a shift for an absent kitchen employee, resulting in him working seven days in that week (70 hours per week).

84. For the duration of Abdeldayem's employment with Defendants, Defendants never provided Abdeldayem with meal breaks, and Abdeldayem was forced to eat while working his shift.

85. From approximately October 1, 2018-March 19, 2020, Defendants paid Abdeldayem every Tuesday, for the work performed during the previous week (Monday-Sunday).

86. Upon Defendants' rehire of Abdeldayem on or around July 1, 2020-February 2, 2022, Defendants changed Abdeldayem's regular payday to every Friday, for the work performed during the previous week (Monday-Sunday).

87. However, at least once per month after Abdeldayem's rehire, Defendants missed Friday payroll and employees, including Abdeldayem, were forced to repeatedly remind Grams that they were not paid for the previous week.

88. As a result, at least once per month from Abdeldayem's rehire until the end of his employment with Defendants, Defendants failed to promptly pay Abdeldayem's wages.

89. For the duration of his employment with Defendants, Abdeldayem was effectively paid a flat daily wage, regardless of how many hours he worked.

90. Each week, Defendants paid half of Abdeldayem's wages by payroll check and the other half in cash or by business or personal check, depending upon the number of days Abdeldayem worked during that pay period.

91. For the portion of Abdeldayem's weekly wage that was paid by cash or by non-payroll check, Defendants withheld a certain amount per day, purportedly for taxes.

92. However, as later became apparent when Abdeldayem informed Grams he needed proof of his total earnings to apply for disability benefits and unemployment insurance, Defendants retained the money withheld from each of Abdeldayem's cash or non-payroll check wage payments purportedly for taxes.

93. During Abdeldayem's employment with Defendants, he was compensated in the following manner:

a. From approximately October 1, 2018-March 11, 2020, Defendants paid Abdeldayem a gross daily wage of $240. During this period, Defendants retained a portion of Abdeldayem's non-payroll wages, purportedly as tax withholdings. As a result, during this period, for the weeks Abdeldayem worked six days per week, he received $1,180 per week, and for the weeks Abdeldayem worked seven days per week, he received $1,460 per week.

b. In or around October 2019, Abdeldayem complained to Grams that he was not receiving proper compensation. Grams refused to offer Abdeldayem a raise and, as a result, Abdeldayem gave Grams his two weeks' notice. However, during the notice period, Grams was unable to find any other "Executive Chef" candidates who would work for the wages Defendants were offering and spend nearly all of their work time performing manual tasks, such as cooking and cleaning. After Grams' unfruitful search for a replacement, prior to the expiration of Abdeldayem's notice period, Grams offered Abdeldayem a raise to $400 per day, which he indicated would take effect immediately. Grams further promised to provide Abdeldayem with health insurance "when he got sick or hurt". Relying on these promises, Abdeldayem agreed to continue for Defendants. However, despite Grams' promise, Defendants did not immediately pay Abdeldayem the increased daily wage. Abdeldayem repeatedly asked Grams when Defendants were going to begin paying him the promised increased rate. Grams regularly ignored and deflected Abdeldayem's complaints until Abdeldayem informed Grams he would resign if he did not receive a raise, in or around mid-March 2020. Immediately after Abdeldayem informed Grams of his intent to resign if he did not receive a raise, Defendants began paying Abdeldayem the promised $400 daily wage.

c. From approximately March 12, 2020-March 19, 2020, Defendants paid Abdeldayem a gross daily wage of $400.  During this period, Defendants retained a portion of Abdeldayem's non-payroll wages, purportedly as tax withholdings.  Abdeldayem worked six days this week, for which he received $2,160.  On or around March 20, 2020, Grams terminated Abdeldayem due to the Coronavirus pandemic, selecting him for termination (as opposed to another chef or cook) because Abdeldayem complained about his pay.  From on or around March 20, 2020-July 1, 2020, Giorgio's sous chef assumed Abdeldayem's position, performing substantially the same tasks in Abdeldayem's role as he did in the sous chef position.  On or around July 1, 2020, due to customer complaints about the quality of the food, Defendants rehired Abdeldayem.

d. From approximately July 1, 2020-September 30, 2020, Defendants paid Abdeldayem a gross daily wage of $400.  During this period, Defendants retained a portion of Abdeldayem's non-payroll wages, purportedly as tax withholdings.  Abdeldayem worked two days per week during this period, for which he received $720 per week.

e. From approximately October 1, 2020-December 31, 2020, Defendants paid Abdeldayem a gross daily wage of $400.  During this period, Defendants retained a portion of Abdeldayem's non-payroll wages, purportedly as tax withholdings.  Abdeldayem worked three days per week, during this period, for which he received $1,080 per week.

f. From approximately January 1, 2021-January 22, 2021, Defendants paid Abdeldayem a gross daily wage of $400.  During this period, Defendants retained a portion of Abdeldayem's non-payroll wages, purportedly as tax withholdings.

Abdeldayem worked four days per week during this period, for which he received $1,440 per week.

g.  From approximately January 23, 2021-February 2, 2022, Defendants paid Abdeldayem a gross daily wage of $400.  During this period, Defendants retained a portion of Abdeldayem's non-payroll wages, purportedly as tax withholdings.  As a result, during this period, for the weeks Abdeldayem worked six days per week, he received $2,180 per week, and for the weeks Abdeldayem worked seven days per week, he received $2,460 per week.

94. This compensation scheme is a blatant, willful violation of the FLSA and NYLL.

95. Additionally, throughout Abdeldayem's employment with Defendants, other kitchen employees repeatedly complained to Abdeldayem about Defendants' refusal to pay them overtime wages.  Although the kitchen staff knew Abdeldayem had no authority to correct their pay, they complained to Abdeldayem because they were aware Abdeldayem met weekly with Grams, spoke fluent English, and was legally authorized to work in the United States.  As Abdeldayem had no authority to modify or correct the kitchen staff's pay, he brought the kitchen staff's complaints to Grams.  When Abdeldayem first brought those complaints to Grams, Grams brushed him off and continued to refuse to pay Giorgio's kitchen staff overtime wages.  After Abdeldayem raised the issue with Grams again, Grams threatened members of the kitchen staff with deportation—demanding they show him their green cards—knowing that most of Giorgio's kitchen staff is undocumented.  After and because Abdeldayem complained to Grams on behalf of Giorgio's kitchen staff about Defendants' failure to pay them overtime wages, Grams became hostile towards Abdeldayem, telling him, "You have to be on my side, not their side," and, "If you don't like [the kitchen staff's pay policy], then leave."

96. In addition to Abdeldayem's complaints of Defendants' unlawful pay practices on his own behalf and on behalf of Giorgio's kitchen staff, during Abdeldayem's employment with Defendants, the Corporation and Grams were named as Defendants in a lawsuit brought by a former Giorgio's cook, asserting violations of the NYLL by the Corporation and Grams as a result of their failure to pay him the overtime premium, furnish him with a wage notice, and furnish him with proper wage statements during the former cook's employment, between May 2016 and 2020.  That action is captioned *Rafael Caropreso v. Giorgio's of Gramercy Inc., and Nick Grams*, Index. No. 654382/2021 (Sup. Ct. N.Y. Cnty.).

97. For the duration of Abdeldayem's employment with Defendants, Defendants failed to correct their pay practices with respect to Abdeldayem and bring them into compliance with federal and New York State law.

98. In or around early-January 2022, Abdeldayem began experiencing severe pain in his left elbow.

99. Because Abdeldayem did not have health insurance as a result of his reliance on Grams' promise to provide Abdeldayem with health insurance in the event Abdeldayem became sick or injured, Abdeldayem could not obtain treatment for his injured elbow.

100.   Abdeldayem advised Grams of his severe elbow pain and requested Defendants provide Abdeldayem with the health insurance Grams promised him in the event Abdeldayem became sick or injured.

101.   On February 2, 2022, Abdeldayem was preparing a brown sauce in a large, heavy pot.  When he and another cook lifted the pot, Abdeldayem felt a pop in his left elbow. That evening, Abdeldayem's elbow was swollen, he was in extreme pain, and he could not sleep.  The next day—February 3, 2022—Abdeldayem went to the hospital, received an MRI and X-ray, and was diagnosed with a sprained left elbow.  Abdeldayem's doctor

indicated he needed approximately 4-6 weeks to heal and advised Abdeldayem to see an orthopedist for further treatment.

102.     Immediately after leaving the hospital, Abdeldayem gave Grams the doctor's note indicating he was seen in the hospital for a sprained elbow and that, upon clearance from an orthopedist, he would be able to return to work without accommodation.  Abdeldayem further told Grams that his elbow required approximately 4-6 weeks to heal, but he needed to see an orthopedist to clear him.

103.     Abdeldayem reached out to several orthopedists, but the only specialist who would see him without insurance did not have availability until April 2022.  Abdeldayem explained to Grams the difficulties he was having securing an appointment with an orthopedist, as a result of his lack of health insurance coverage.  Despite Abdeldayem's reminder of Grams' promise to provide him with health insurance when he became sick or injured, Defendants refused to provide him with health insurance.

104.     Over the next two weeks, Abdeldayem called Grams, Giorgio's General Manager, Sasha [last name currently unknown] ("Sasha"), and Giorgio's Manager, Pettro [last name currently unknown] ("Pettro"), on at least six occasions requesting insurance coverage. However, Defendants continued to refuse to provide him with health insurance.

105.     On or around February 15, 2022, Abdeldayem asked Grams for his check for the days he worked prior to his injury.

106.     Grams responded that when Abdeldayem "took time off" for his injury, Grams told Sasha to stop Abdeldayem's check.  Abdeldayem then called Sasha, who told him that Grams told her Grams thought Abdeldayem was faking his injury, despite Abdeldayem having provided Grams with documentation from the hospital showing he was diagnosed with a sprained elbow.  Abdeldayem then called Pettro, who told Abdeldayem that Grams

also told **him** Grams thought Abdeldayem was faking his injury.  Pettro also mentioned

that Grams was angry Abdeldayem did not work on Valentine's Day—despite knowing

Abdeldayem could not work for at least another several weeks due to his injury.

107.     In or around the end of February, Abdeldayem met with Grams to discuss his return

to work.  Prior to this meeting, Abdeldayem was expecting to return to his role full-time

upon recovery from his elbow injury; however, during this meeting, Grams told

Abdeldayem that he would only allow Abdeldayem to return for three days per week, at

$400 per day.  Having no other choice and needing the income, Abdeldayem reluctantly

accepted the significantly reduced schedule (and income), and Grams put Abdeldayem on

the schedule for early-March.

108.     Abdeldayem spoke with Pettro and advised Pettro that since Grams cut his hours—

effectively making Abdeldayem a part-time employee—there were some tasks

Abdeldayem would not be able to perform.  Pettro told Abdeldayem he would speak with

Grams about reducing Abdeldayem's responsibilities.

109.     In or around early-March 2022, Grams told Abdeldayem that he was causing more

problems than he was worth and, in further discrimination against him because of his

sprained elbow and in retaliation against him for his opposition to Grams' discriminatory

reduction of his hours, Grams terminated Abdeldayem's employment with Defendants.

110.     During his conversation with Grams in which Grams advised Abdeldayem of his

termination, Abdeldayem requested Defendants provide him with disability pay for the

previous month he was out.  However, Grams refused, directing Abdeldayem to look for

another job or apply for unemployment insurance and disability benefits.  After Grams

reaffirmed Abdeldayem's termination, Abdeldayem requested a termination letter from

Defendants, stating his income, so he could receive the full unemployment insurance and disability benefits to which he was entitled.

111.     However, Grams told Abdeldayem he would state only the amount of wages Defendants paid Abdeldayem on a payroll check as Abdeldayem's income and refused to include the amount of wages Defendants paid Abdeldayem in cash or by personal or business check.

112.     Abdeldayem was confused by Grams' refusal to accurately indicate all of the wages Defendants paid to him, as throughout Abdeldayem's employment with Defendants, Defendants withheld wages from every cash or non-payroll check payment, purportedly for taxes.

113.     When Abdeldayem asked Grams why he withheld money from Abdeldayem's non-payroll wages if Defendants were not reporting those wages to the taxing authorities, Grams responded, **"It's business.  I have to do the best for my business."**

114.     Grams then told Abdeldayem he was willing to give Abdeldayem a Form 1099 for the amount of non-payroll check wages paid by Defendants to Abdeldayem, which would falsely state that Abdeldayem earned the non-payroll wages paid by Defendants to Abdeldayem from "self-employment".  However, Grams advised Abdeldayem that even if Defendants designated the non-payroll wages paid to Abdeldayem as "self-employment" compensation and issued him a Form 1099 for those wages, Grams would not indicate that amount in a letter confirming Abdeldayem's income.

115.     Abdeldayem was upset with Defendants' apparent theft of his "withheld" wages and their attempt to make Abdeldayem complicit in a patently unlawful tax avoidance scheme—a scheme which would also result in Abdeldayem receiving reduced unemployment insurance and disability benefits.

116.    Abdeldayem advised Grams he was going to report his non-payroll wages to the Department of Labor when he applied for unemployment insurance and disability benefits.

117.    Grams became alarmed and directed Abdeldayem not to report his full income to the Department of Labor.

118.    Grams then promised Abdeldayem that if he reported only the payroll check wages Defendants paid him as income to the Department of Labor, Grams would pay Abdeldayem, each week, the difference between $1,000 and the amount of unemployment insurance and disability benefits Abdeldayem received.

119.    Because Grams refused to provide Abdeldayem with confirmation of his total wages received, Abdeldayem was only able to report the wages reflected on his W-2 to the Department of Labor.

120.    As a result, the amount of unemployment insurance benefits received by Abdeldayem was less than he would have received had Defendants accurately reported the actual amount of wages they paid Abdeldayem.

121.    Since that conversation with Grams, Abdeldayem has not received any further payment from Defendants.

122.    For the duration of his employment with Defendants, Defendants did not pay Abdeldayem the one-and-one-half (1 ½) overtime premium rate for each hour he worked beyond 40 hours in a week.

123.    For the duration of his employment with Defendants, Defendants did not pay Abdeldayem any additional pay when his shift or shifts exceeded 10 hours per day.

124.    For the duration of his employment with Defendants, Defendants failed to keep accurate records of wages earned or hours worked by Abdeldayem.

125.    At the time of his hire, his rehire, or at any point thereafter, for the duration of Plaintiff's employment with Defendants, Defendants failed to furnish Abdeldayem with an accurate and complete statement with every payment of wages listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.

126.    At the time of his hire, his rehire, or at any point thereafter, for the duration of Plaintiff's employment with Defendants, Defendants failed to furnish Abdeldayem with a wage notice setting forth his rate of pay, exempt status, overtime rate, method of compensation, regular payday, names of her employers (including fictitious names), addresses and phone numbers for her employers' main offices or principal locations, or any allowances taken.

127.    After and because of his complaints of Defendants' unlawful pay practices, Defendants retaliated against Plaintiff by selecting him (as opposed to another cook) for termination during the Coronavirus pandemic, by creating a hostile work environment for Plaintiff after Plaintiff's complaint on behalf of the kitchen staff, by terminating Plaintiff's employment, and by refusing to provide Plaintiff with a true and accurate accounting of his wages so Plaintiff could receive the full amount of unemployment insurance and disability benefits to which he was entitled.

128.    Defendants' violations of the FLSA and NYLL as relating to Abdeldayem's employment with Defendants have been willful.

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act – Unpaid Overtime Wages**

129.     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

130.     Defendants are employers within the meaning of 29 U.S.C §§ 203(e) and 206(a)

and employed Abdeldayem.

131.     Defendants were required to pay Abdeldayem one and one-half (1 ½) times the

regular rate of pay/applicable minimum wage rate for all hours worked in excess of 40

hours in a workweek.

132.     Defendants failed to pay Abdeldayem the overtime wages to which he was entitled

under the FLSA.

133.     Defendants willfully violated the FLSA by knowingly and intentionally failing to

pay Abdeldayem overtime wages.

134.     Defendants' violations of the FLSA described above have been willful, and

therefore, a three-year statute of limitations applies to this matter pursuant to the FLSA, 29

U.S.C. § 255(a).

135.     As a result of Defendants' willful violations of the FLSA, Abdeldayem is entitled

to recover from Defendants his unpaid overtime wages, liquidated damages, pre-judgment

interest, post-judgment interest, attorneys' fees, and costs and disbursements of this action

pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**New York Labor Law – Unpaid Overtime Wages**

136.     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

137.     Under the NYLL and supporting New York State Department of Labor Regulations,

Defendants were required to pay Abdeldayem one and one half (1 ½) times the regular rate

of pay/applicable minimum wage rate for all hours he worked in excess of forty (40) hours per week.

138.     Defendants failed to pay Abdeldayem the overtime wages to which he is entitled under the NYLL.

139.     Defendants willfully violated the NYLL by knowingly and intentionally failing to pay Abdeldayem overtime wages.

140.     As a result of Defendants willful violations of the NYLL, Abdeldayem is entitled to recover his unpaid overtime wages, liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to NYLL §§ 663(1), *et seq*.

**THIRD CAUSE OF ACTION**
**New York Labor Law – Unpaid Spread-of-Hours Pay**

141.     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

142.     Defendants have willfully failed to pay Abdeldayem additional compensation of one hour's pay at the minimum hourly wage rate in all instances where Abdeldayem worked either a split shift or more than 10 hours per day, in violation of NYLL §§ 650, *et seq.* and the regulations promulgated thereunder including N.Y. Comp. Code R. & Regs. Tit. 12 §§, 137-1.7 (2010), 146-1.6 (2012).

143.     As a result of Defendants' willful violations of the NYLL, Abdeldayem is entitled to recover unpaid spread-of-hours compensation, liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to the NYLL.

**FOURTH CAUSE OF ACTION**
**New York Labor Law – Wage Theft Prevention Act Notice Violations**

144.     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

145.     NYLL § 195(1)(a) obligates every employer to: "provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, a notice containing the following information:  the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other;  allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;  the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article;  the name of the employer;  any "doing business as" names used by the employer;  the physical address of the employer's main office or principal place of business, and a mailing address if different;  the telephone number of the employer;  plus such other information as the commissioner deems material and necessary.  Each time the employer provides such notice to an employee, the employer shall obtain from the employee a signed and dated written acknowledgement, in English and in the primary language of the employee, of receipt of this notice, which the employer shall preserve and maintain for six years."

146.     Defendants failed to provide Plaintiff with a wage notice compliant with NYLL § 195(1)(a) either at the time of his initial hire or at the time of his rehire.

147.     Due to Defendants' violations of NYLL§ 195(1), Plaintiff is entitled to statutory penalties of $50.00 for each workday that Defendants failed to provide wage notices, up to a maximum of $5,000 for each period of employment, reasonable attorneys' fees, costs and injunctive and declaratory relief, as provided by NYLL § 198(1-b).

148.     Defendants violated NYLL § 195(3) by failing to furnish Plaintiff, with each payment of wages, an accurate statement listing the dates of work covered by that payment or wages; name of employee; name of employer; address and phone number of employer; rate of rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary,

piece, commission, or other; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked; gross wages, deductions, allowances, if any, claimed as part of the minimum wage; and net wages.

149.     Through their failure to provide Plaintiff with wage statements as required by the NYLL, Defendants have violated NYLL § 190, *et seq*., and the supporting New York State Department of Labor Regulations.

150.     Due to Defendants' violations of NYLL § 195(3), Plaintiff is entitled to statutory penalties of $250.00 for each workweek that Defendants failed to provide him with accurate wage statements, up to a maximum of $5,000 for each period of employment, reasonable attorneys' fees, costs and injunctive and declaratory relief, as provided for by NYLL § 198(1-d).

## FIFTH CAUSE OF ACTION
### Fair Labor Standards Act – Recording Keeping Violations

151.     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

152.     At all times relevant to this action, Defendants were and are required to establish, maintain, and preserve, for not less than six years, weekly payroll records that show for each employee, among other information, true and accurate payroll records and the number of hours worked daily and weekly, including the time of commencement of and cessation of work performed by each employee.  29 C.F.R. Part 516.

153.     Defendants violated the applicable FLSA provisions by, *inter alia*, not maintaining and preserving Plaintiff's time of commencement of and cessation of work performed for Defendants and the pay received by Plaintiff.

## SIXTH CAUSE OF ACTION
### New York Labor Law – Recording Keeping Violations

154.     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

155.     At all times relevant to this action, Defendants were and are required to establish, maintain, and preserve, for not less than six years, weekly payroll records that show for each employee, among other information, true and accurate payroll records and the number of hours worked daily and weekly, including the time of commencement of and cessation of work performed by each employee.  NYLL § 195(4); 12 N.Y.C.R.R. § 142-2.6.

156.     Defendants violated the applicable NYLL and NYCRR provisions by, *inter alia*, not maintaining and preserving Plaintiff's time of commencement of and cessation of work performed for Defendants and the pay received by Plaintiff.

## SEVENTH CAUSE OF ACTION
### Fair Labor Standards Act – Retaliation

157.     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

158.     Plaintiff was an employee of Defendants within the meaning of the FLSA.

159.     Defendants were employers of Plaintiff within the meaning of the FLSA.

160.     29 U.S.C. § 215(a)(3) prohibits any person, "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

161.     While employed by Defendants, Plaintiff complained to Defendants repeatedly about Defendants' unlawful employment practices, including Defendants' insufficient payment of his wages, Defendants' failure to pay overtime wages to the kitchen staff, and Defendants' refusal to provide a complete and accurate accounting of Plaintiff's wages.

162.     Plaintiff's complaints constitute protected activity under the FLSA.

163.    After and as a result of his complaints of Defendants' unlawful pay practices, Defendants retaliated against Plaintiff by selecting him (as opposed to another cook) for termination during the Coronavirus pandemic, by creating a hostile work environment for Plaintiff after Plaintiff's complaint on behalf of the kitchen staff, by terminating Plaintiff's employment, and by refusing to provide Plaintiff with a true and accurate accounting of his wages so Plaintiff could receive the full amount of unemployment insurance and disability benefits to which he was entitled.

164.    A causal connection exists between Plaintiff's complaints of Defendants' unlawful pay practices and Defendants' selecting him (as opposed to another cook) for termination during the Coronavirus pandemic, creating a hostile work environment for him after his complaint on behalf of the kitchen staff, terminating his employment, and refusing to provide him with a true and accurate accounting of his wages so he could receive the full amount of unemployment insurance and disability benefits to which he was entitled.

165.    Defendants violated 29 U.S.C. § 215(a)(3) by selecting Plaintiff (as opposed to another cook) for termination during the Coronavirus pandemic, by creating a hostile work environment for Plaintiff after Plaintiff's complaint on behalf of the kitchen staff, by terminating Plaintiff's employment, and by refusing to provide Plaintiff with a true and accurate accounting of his wages so Plaintiff could receive the full amount of unemployment insurance and disability benefits to which he was entitled, in retaliation for Plaintiff's complaints of Defendants' unlawful pay practices.

166.    Due to Defendants' violations of 29 U.S.C. § 215(a)(3), Plaintiff is entitled to recover from Defendants his lost wages and other compensatory damages, liquidated damages in an amount equal to his lost wages, pre-judgment and post-judgment interest, along with reasonable attorneys' fees, costs and injunctive and declaratory relief.

## EIGHTH CAUSE OF ACTION
### New York Labor Law – Retaliation

167.     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

168.     Plaintiff was an employee of Defendants within the meaning of the NYLL.

169.     Defendants are employers of Plaintiff within the meaning of the NYLL.

170.     NYLL § 215(1) states, in part, "No employer or his or her agent, or the officer of agent of any corporation, partnership, or limited liability company…shall discharge, threaten, penalize or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer…or his or her authorized representative…that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter…[or] (iii) because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter…or (v) because such employee has otherwise exercised rights protected under this chapter…"

171.     While employed by Defendants, Plaintiff complained to Defendants repeatedly about Defendants' unlawful employment practices, including Defendants' insufficient payment of his wages, Defendants' failure to pay overtime wages to the kitchen staff, and Defendants' refusal to provide a complete and accurate accounting of Plaintiff's wages.

172.     Plaintiff's complaints to Defendants constitute protected activity under NYLL § 215.

173.     A causal connection exists between Plaintiff's complaints of Defendants' unlawful pay practices and Defendants' selecting him (as opposed to another cook) for termination during the Coronavirus pandemic, creating a hostile work environment for him after his complaint on behalf of the kitchen staff, terminating his employment, and refusing to

provide him with a true and accurate accounting of his wages so he could receive the full amount of unemployment insurance and disability benefits to which he was entitled.

174.     Defendants violated NYLL § 215 by selecting Plaintiff (as opposed to another cook) for termination during the Coronavirus pandemic, by creating a hostile work environment for Plaintiff after Plaintiff's complaint on behalf of the kitchen staff, by terminating Plaintiff's employment, and by refusing to provide Plaintiff with a true and accurate accounting of his wages so Plaintiff could receive the full amount of unemployment insurance and disability benefits to which he was entitled, in retaliation for Plaintiff's complaints of Defendants' unlawful pay practices.

175.     Plaintiff is entitled to recover from Defendants lost wages and other compensatory damages and liquidated damages, in addition to reasonable attorneys' fees, costs, declaratory and injunctive relief, as a result of Defendants' retaliatory conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

A.   Declaring that the practices complained of herein are unlawful under applicable state and federal law;

B.   Declaring that Defendants are joint employers of Plaintiff under the FLSA and NYLL;

C.   Declaring that Defendants violated the overtime provisions of the FLSA, NYLL and supporting New York State Department of Labor Regulations;

D.   Declaring that Defendants violated the spread-of-hours pay provisions of the NYLL and New York State Department of Labor Regulations;

E.   Declaring that Defendants violated the notice provisions of the NYLL and Wage Theft Prevention Act;

F.   Declaring that Defendants violated the record keeping provisions of the FLSA, NYLL and New York State Department of Labor Regulations;

G.  Declaring that the Defendants violated the anti-retaliation provisions of the FLSA and NYLL after and because Plaintiff complained of and/or opposed Defendants' unlawful pay practices, policies and procedures;

H.  Declaring that Defendants' violations of the FLSA and NYLL were willful;

I.  Awarding Plaintiff unpaid overtime wages;

J.  Awarding Plaintiff unpaid spread-of hours compensation;

K.  Awarding Plaintiff liquidated and/or punitive damages in amount equal to the total amount of wages found to be due, pursuant to the FLSA and NYLL;

L.  Awarding Plaintiff statutory penalties for Defendants' failure to furnish wage notices and/or complete and accurate wage statements pursuant to the NYLL;

M.  Awarding Plaintiff compensatory damages, pursuant to the FLSA and NYLL, retroactive to the date of his termination, for all lost wages and benefits sustained as a result of Defendants' retaliatory conduct after and because of Plaintiff's complaints of and/or opposition to Defendants' unlawful pay practices;

N.  Awarding Plaintiff liquidated and/or punitive damages, pursuant to the FLSA and NYLL, for Defendants' violations of those statutes as a result of Defendants' retaliatory conduct after and because of Plaintiff's complaints of and/or opposition to Defendants' unlawful pay practices;

O.  Awarding Plaintiff reasonable attorney's fees, costs, and expenses incurred, pursuant to the FLSA and NYLL;

P.  Awarding Plaintiff pre-judgment and post-judgment interest, pursuant to the FLSA and NYLL;

Q.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendants' unlawful employment practices.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated:  June 9, 2022
        New York, New York

                                Respectfully submitted,

                                **AKIN LAW GROUP PLLC**

_/s/ Justin Ames_
Justin Ames, Esq.
45 Broadway, Suite 1420
New York, NY 10006
Telephone: (212) 825-1400
Justin@akinlaws.com
_Attorneys for Plaintiff_